The **NATIONAL LIFE AND ACCIDENT IN-SURANCE COMPANY, Appellant,**

**v.**

**Woodie Mae MORRIS, Appellee.**

**No. 11388.**

Court of Civil Appeals of Texas.

Austin.

April 20, 1966.

Rehearing Denied May 4, 1966.

Blanks, Thigpin, Logan, Steib & Lewis, Curtis F. Steib, San Angelo, for appellant.

Wilson, Logan, Lear & Massey, Tom C. Massey, San Angelo, for appellee.

ARCHER, Chief Justice.

This is an appeal from the judgment of the District Court, based on findings of a jury, in favor of appellee for $2250.00 for benefits due from the accidental death of the named insured, $270.00 statutory penalty of 12% of the principal amount and $800.00 attorney's fee, with interest at the rate of 6% and costs.

The policy was written upon the life of L. Dow Morris, husband of plaintiff Woodie Mae Morris. The policy provided for the payment of a face amount of $750.00 with no suicide exclusions, and which had been paid prior to this suit.

The controversy in this case centers around the payment of additional benefits equal to three times the face amount of the policy if the death of the deceased resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means. These accidental triple indemnity payments are subject to a suicide exclusion.

The case was submitted to a jury on special issues who found that the death of the deceased resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means, and that the death was not caused solely by cyanide poisoning, and

that cyanide poisoning did not contribute to the death.

Appellant's position is that the cause of death was not established by competent evidence.

▉ The appeal is based on seventeen points but may be consolidated into two divisions. The first division is directed to the sufficiency of the plaintiff's pleadings to give fair notice as to the cause of the death of Mr. Morris.

Paragraph five of the pleadings is as follows:

"5. Shortly after noon on October 27, 1963, L. Dow Morris was riding as a passenger in an automobile proceeding east on Beauregard Avenue in the City of San Angelo. At the intersection of Beauregard and Oakes Street, the Morris automobile was struck by a truck traveling North on Oakes Street. In the grinding accidental collision between the truck and the automobile in which L. Dow Morris was riding, L. Dow Morris was thrown about the interior of the automobile, striking his head, chest and other parts of his body on the hard objects of the automobile, causing L. Dow Morris to suffer certain physical injuries, specifically a concussion of the brain, multiple bruises, contusions and lacerations, damaging and injuring the bones, muscles, ligaments, tendons, nerves, blood vessels and soft tissues of his head, neck and chest, all of which severally or in concurrence proximately and directly caused his resulting death, which death occurred in the emergency room of the Shannon Hospital at 1:45 p. m. that day."

Paragraph six is as follows:

"6. Plaintiff would further show that the injuries described in Paragraph Five (5) above directly and proximately and independently of all other causes, caused the death of L. Dow Morris, which death resulted from the bodily injuries effected solely through the accidental collision described before, and which death was caused solely by external, violent and accidental means."

We believe that the pleading does give defendant a fair notice as to the cause of death of Mr. Morris.

The defendant knew of the accident and the death of Morris on the day following and at a time when the body had not been placed in the casket, and defendant's agent had already picked up the policy.

▉ The trial court's ruling that the pleadings were sufficient will not be disturbed absent a showing of abuse. A large measure of discretion is lodged in the trial court in passing on the exceptions to the pleadings. Southern Underwriters v. Hodges, Tex.Civ.App., 141 S.W.2d 707, er. ref.

Appellant's remaining points may be considered as another division and disposed of together, since all the points are directed to the sufficiency of the evidence to support the findings of the jury, and the admission of the testimony of Dr. Robert Martinez that the accident was the cause of the death of Mr. Morris, over defendant's objection that the witness did not have adequate factual basis to form an opinion either from actual observation and knowledge or from hypothetical questions based upon other evidence in the record.

The testimony of Dr. Martinez, in part, is:

"Q Did you receive a call that date to the Emergency Room?

A Yes, sir, I did.

Q Whom did you administer to at the Emergency Room of the Shannon?

A Mr. Dow Morris.

Q Mr. Dow Morris. Was he the only one?

A No, sir. There were two others.

Q And you administered to them too?

A Yes, sir.

Q Was one of them Mrs. Morris?

A Yes, sir.

Q Now, what we are interested in, Dr. Martinez, is the condition of Mr. Dow Morris at the time you saw him there in the Emergency Room.

A Well, as I walked into the Emergency Room there was a very strong odor of cyanide. The nurse told me that he had taken cyanide poison; and I walked up to him and I was surprised to see him alive because of the strong odor of cyanide; and he was breathing, he had a pulse of 80, which was thready, and had no blood pressure. So immediately I started intravenous fluids to bring his blood pressure back up; however, he expired about five minutes after we started the fluids on him. I attempted external cardiac massage for a few minutes, and that did not help, and finally pronounced him dead.

Q You say he expired five minutes, about five minutes after you started the intravenous fluids?

A Yes, sir.

* * * * * *

Q What about his appearance, Dr. Martinez?

A Well, he was quite pale all the time I was there, and when he expired he was very pale. He had several superficial lacerations about his face and had a bruise over his forehead.

Q What part of the forehead, sir?

A Over the—

Q Just show with your hand.

A More or less over the middle and right side (indicating).

Q A bruise?

A Yes, sir.

Q Was this rather pronounced or was it just a slight bruise?

A Oh, it wasn't a severe bruise.

* * * * * *

Q Did he have cuts over his neck, on his throat?

A Yes, sir, on the sides.

Q On the sides of the throat?

A Yes, sir.

Q Was the midportion of his face bruised or lacerated?

A The what?

Q The midportion of his face, Doctor, was it—

A I don't recall. I just recall the bruise on his forehead.

Q Bruise on his forehead and lacerations, I believe you called it, about his face and his throat?

A Yes, sir.

Q Both sides of his neck?

A Yes, sir.

Q Were you called upon at that time to assign a cause of death?

A Yes, sir, I was.

Q And did you assign a cause of death?

A Yes, sir; I put down that it was probably cyanide poisoning.

Q Probably cyanide poisoning?

A Yes, sir.

Q Have you changed your mind since then?

A Yes, sir.

Q What is the basis for your change of mind, Dr. Martinez?

A Well, after I inquired further into cyanide poisoning, I read several textbooks on the subject, and they all said that people who took cyanide in a lethal dose usually died in cyanosis, and they usually died within a few seconds after they took it; and he was quite pale and he lived

at least—well, I know he lived at least twenty minutes.

Q Now, you used the term, Dr. Martinez, 'cyanosis.' Would you explain to me and the jury what that means?

A Cyanosis means a bluish color of the skin, due to lack of oxygen.

Q How does this come about?

A Well, cyanosis interferes with the passage of oxygen into the body tissues—I mean cyanide interferes with the passage of oxygen into the body tissues, since the body tissues don't get oxygen they turn blue.

Q Is this true how cyanide poison reacts in the blood?

A Yes, sir.

Q Now, is this generally the case that a person dying of a lethal dose of cyanide poisoning will have this bluish color?

A Yes, sir.

Q Or to put it technically be cyanotic?

A Yes, sir.

*    *    *    *    *    *

Q You think, then, that after having lived that long, what you just stated, you think the chances are very little that he died of cyanide poisoning if he lived that long?

A Yes, sir.

Q In your opinion, from what you recall of the Emergency Room and L. Dow Morris on that October date, that he had received sufficient injuries—that he evidenced sufficient injuries to have caused his death?

A Yes, sir."

Dr. Martinez was carefully and extensively examined on cross-examination as to the cause of death, and testified that:

"A From a blunt blow to his forehead.

Q He died from a blunt blow to his forehead. Now what makes you say that?

A Because of the bruise he had on his forehead.

Q Did you examine him? Can you say whether his skull was fractured?

A No, sir.

Q Can you say now whether he had any brain damage?

A No, sir.

*    *    *    *    *    *

Q Dr. Martinez, you testified that L. Dow Morris was in shock, obviously in shock?

A Yes, sir.

Q Could this have been caused by the accident?

A Yes, sir.

Q Very likely caused by the accident?

A Yes, sir.

*    *    *    *    *    *

Q At that time you had never had a cyanide poisoning case?

A No, sir.

Q This was your first one?

A Yes, sir.

Q And you did what you absolutely considered to be to the patient's best interests?

A Yes, sir.

Q And with the time involved, that is five minutes, as you testified a while ago, from the time you got there until the time he expired, you would do the same thing, you would treat him the same way?

A Yes, sir.

Q This is because of his shock, primarily?

A Yes, sir.

Q And it is your opinion that his death was not caused by cyanide poisoning?

A Yes, sir.

Q And it is your opinion that his death was caused by the injury he received in the collision he was in?

A. Yes, sir."

As concerns the collision Edgar Lee White testified he saw a car run a red light driven by a lady traveling rather fast, and saw in the car a man sitting leaning on the post in the front part of the car, at the window, and that he followed the car and saw the wreck occur.

No details are given as to the wreck or of others except that Mrs. Morris was driving one car and Mr. Morris was in the car. Mrs. Morris received extensive injuries and was hospitalized.

We insert herein a picture of the car driven by Mrs. Morris, taken after the collision, and from its demolished condition the impact must have been very great.

Mrs. Linda Willbern, a daughter of the deceased, testified that she viewed the body of her father at the funeral home, and saw:

"A Well, he had, on the right side of his head and over his eye it looked like a long gash, the brow was protruded, was blue and discolored around his cheek, and then I noticed a gash that hadn't been covered up, and so I bent forward and I could see the other side of his face, it was also bruised and cut, all cut down into his neck; and then his hands were the only things that were visible other than that and they were both very bruised."

L. D. Morris, a son of the deceased, testified that he heard of the accident on the

radio and left to look for his folks; that he saw his father at the funeral home the next day, and saw bruises on his face, one eye, his nose was badly swollen and a cut across the front of his neck.

Dr. Lloyd R. Hershberger, a physician, specializing in pathology, which deals with the causes of disease, and the changes that occur in the body because of disease, testified that cyanide was one of the most lethal, deadly poisons and can be swallowed, inhaled and absorbed in the stomach lining, affects the body by a paralysis on the respiratory center, and the body lacks oxygen, and the person becomes limp and unconsciousness follows.

In answer to a hypothetical question assuming certain facts Dr. Hershberger testified:

"Q   What is your opinion, Doctor?

A   Now, based on the odor, based on the color, based on the pulse and respiration, and based on the lack of bleeding, I would have to consider cyanide as my first choice.

Q   Now, Doctor, from these facts as I have given them to you, would it be possible for you to express an opinion that is medically fairly accurate about the accident, without you knowing any more than I have told you here, is it possible for you to express an opinion within a medical degree of certainty whether or not this accident could have been the cause of death, on the basis of these particular facts?

A   Based on the facts, you mentioned a bruise, so that the patient was still living at the time of the accident, so I know that he was still living at that time; but all you have mentioned to me was superficial lacerations as far as injury is concerned, I would not be justified on those two findings to consider that this was a death due to the automobile accident.

\*       \*       \*       \*       \*       \*

Q   Under these circumstances, Doctor, in your opinion and experience is it possible for anybody to say that the accident, based on these facts, was the sole and exclusive cause of this person's death?

A   No.  You can not say that for this reason:  We have got these other things that you have mentioned to me, the odor, and so forth, I have to include them, so I would not be able to say that the accident is the sole cause of death."

Dr. Raleigh F. Trotter, a physician, specializing in pathology, testified in answer to a hypothetical question:

"Q   From the situation that I have described to you, would you say with any degree of certainty whether the odor came from poison ingested or poison spilled upon his shirt?

A   I couldn't state whether it came from ingestion or from his clothing, no.

Q   Dr. Trotter, with regard to the lapse of time after the ingestion of poison, of the ingestion of cyanide poison, the lapse of time between ingestion and death, what is the customary lapse of time?  Is there such a thing as customary lapse of time between taking in a lethal dose and death?

A   There is no customary time.  Cyanide has been known for many years to be one of the most rapid, varying from just a few minutes, and the longer times are rare cases, they have been reported up to three hours, but the longer ones are rare."

■   We believe that the testimony of Dr. Martinez was properly admitted because he based his opinion upon his examination, observations and facts he had been told existed.

■   We believe that the testimony supports the jury's finding that the death of

the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means.

The jury could draw all reasonable inferences from the facts before it and on the evidence, and could, as it did, reasonably conclude that the insured sustained in the collision injuries of such a nature as to have caused his death.

We do not believe that the findings of the jury are contrary to the overwhelming weight of the evidence in the record, but such jury findings are reasonably supported by the evidence.

We have herein set out the evidence and there is no need to restate such. Millers' Indemnity Underwriters v. Schrieber et al., Tex.Civ.App., 240 S.W. 963, er. ref.; Fry v. Dixie Motor Coach Corporation, 142 Tex. 589, 180 S.W.2d 135; National Life and Accident Insurance Company v. Brogdon, Tex.Civ.App., 322 S.W.2d 403, n. w. h.

█ We, as a reviewing Court, must and do view the evidence in support of the judgment.

Appellant cites a number of cases such as Gipson v. Aetna Insurance Company, Tex. Civ.App., 373 S.W.2d 311, n. w. h.

█ The presumption of law against suicide supports the finding of accidental death. Great Southern Life Ins. Co. v. Watson, Tex.Civ.App., 343 S.W.2d 921, er. ref., n. r. e.

In its reply brief appellant cites Mutual Benefit Health & Accident Association v. Hudman, 398 S.W.2d 110, Sup.Ct., as being determinative of this appeal.

A distinction may be made in the instant case and the Hudman case because in the Hudman case the evidence showed that preexisting serious heart disease and overexertion concurred to cause the fibrillation of the insured's heart and in turn his death.

In the instant case there is sole reliance on the accidental injuries as causing the death of Mr. Morris, not contributed to by any other cause, within the preexisting frailty or enfeeblement of the human body.

The judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice (concurring).

There is evidence in this record that Mr. Morris drank from a bottle containing liquid which smelled like cyanide. There is no evidence of the quantity of the liquid ingested.

Dr. Martinez testified that in his opinion Mr. Morris did not die of cyanide poisoning but that he died from a blunt blow on the head. The length of time which Mr. Morris lived after drinking from the bottle and the lack of cyanosis (bluish or reddish coloring of the body skin) caused Dr. Martinez to reach the conclusion that Mr. Morris did not die of poisoning. Dr. Martinez testified that the poisoning contributed to his death "because it might have weakened his condition."

Dr. R. F. Trotter, a recognized pathologist in San Angelo, answering a hypothetical question embracing facts proved, as to the cause of death of Mr. Morris, testified: "A suspicion would have to be cyanide poisoning because of the odor. Having very little to go on, the premise would have to be that until proven otherwise; however, in the absence of cyanosis I could not state that the death was from cyanide."

Dr. Trotter testified that cyanide is a very rapid acting poisoning. He also testified:

"Q Now, you stated a few moments ago, Dr. Trotter, that the cyanosis is an important factor in this matter of cyanide poisoning. How important is the time factor, sir?

A In any respiratory distress, the longer that it goes on the more intense you might consider the cyanosis to be.

Q Do you mean by that that you would expect a person to be more cyanotic twenty minutes after he ingested poison, assuming he is still alive, to be more cyanotic then than he was ten minutes or five minutes after he took the poison?

A Correct.

Q Now, does this cyanosis fade? Does the normal color return or does another color replace this cyanotic color, generally speaking?

A Well, the cyanosis as you observed it would only clear up if the person recovered and oxygenation became normal again. If the mucosa or internally the person was examined and it had a reddish appearance, in time they didn't clear up he may become more brownish in appearance.

Q All right. So, are you saying, Doctor, that if a person lived for as long as 45 minutes or an hour after he took poison and got over the cyanosis that you would expect him to recover from the effects of the poison?

A. If his cyanosis clearned I would have expected him to start oxygenating, if you want to call it that, again; yes, I would have to put it that way."

On cross examination by appellant, Dr. Trotter testified as follows:

"Q Now, Doctor, is it your testimony that cyanosis is an indispensable element in the diagnosis of cyanide poisoning, in all cases?

A Sir, there are always exceptions in medicine.

Q I gather your answer is 'no,' that it is not an indispensable element in all cases?

A I am sure there will be exceptions.

Q Doctor, assuming that a patient is brought into the Shannon Emergency Room with either no blood pressure or rather low blood pressure, with a weak, thready pulse of approximately eighty, the examining physician does not know whether the pupils are dilated or contracted; the examining physician does not know what the patient's reflexes are, whether he has any reflexes, and so forth; the examining physician at that point does not know whether the patient can raise his arms or whether the arms just flop down; the examining physician finds superficial lacerations; and assuming that the examining physician finds a bruise about the size of a half a dollar on a portion of the forehead and brow; assume further that the examining physician finds the patient breathing slow and irregular; assume that the patient is admitted to the emergency room at approximately 1:25 p. m., and assume that the patient expires about 1:45 p. m.; assume further that there is a history of an automobile accident, and there is also a history and a smell of burnt almond, that there is a history or a suspicion that this particular patient drank cyanide some, oh, let's say some 30, 40 minutes prior to that time.

Assuming that this is all the information that the physician has. Now, from this set of facts, if this is all that is available, from this set of facts, is it medically, scientifically possible for the physician to express a medical opinion that the automobile accident was the sole cause of this person's death?

A It could be.

Q I say, with no further facts, is it possible for the physician to express an opinion that the automobile accident is the sole cause of the patient's death?

A   Well, I certainly agree with the counsellor that that is not very many facts to go on. However, there are two factors there based upon the time on which he could make that statement, one of which, the lack of cyanosis, and one of which is the rapid pulse.

Q   All right. Now, let me ask you this: Under those facts can you rule out completely that the cyanide has no contributing cause to the death?

A   To be perfectly honest you could not rule out that it did not have a contributing effect.

Q   In other words, you just don't know, isn't that right, Doctor?

A   In the absence of a post mortem examination you would have to say we do not know exactly. There is a reasonable doubt.

Q   Well, there is a pretty big element of doubt, just what the man died of, isn't there Doctor?

A   Yes, there is a reasonable doubt.

Q   As far as that goes, he could have died of a heart attack, with these facts?

A   Correct.

Q   He could have died from any number of things?

A   He could have."

The evidence, in my opinion, heavily preponderates to the conclusion that Mr. Morris did not die of cyanide poisoning. The only contrary evidence is supplied by Dr. Lloyd R. Hershberger, who, in answering a hypothetical question containing the basic proved facts, testified that as to the cause of death of Mr. Morris, "I would have to consider cyanide as my first choice."

Since the jury could rule poisoning out as the cause of death it could, under the testimony of Dr. Martinez, find that the death of Mr. Morris was caused by a blow on the head. It could also find that this was the sole cause of death unless the statement by Dr. Martinez that poisoning "might have weakened his condition" and hence contributed to his death precludes, as a matter of law, such finding.

Appellant strongly relies upon Hudman, cited by the Court, to sustain its position that the testimony of Dr. Martinez, in this respect, necessarily, and as a matter of law, established that the injuries received by Mr. Morris in the automobile accident were not the sole cause of his death. I do not so consider Hudman. I believe that the "weakened" condition of Mr. Morris, due to the ingestion of cyanide, was, factually at least, only a "preexisting condition or disorder" within the following language of that opinion:

"We do not hold that every preexisting frailty or enfeeblement of the human body which coexists with an accidental injury will defeat recovery under such policies as Hudman's. To do so would defeat recovery in most instances because mere senescence makes all flesh heir to infirmity and weakness. Policies are, to use Cordozo's phrase, issued to those who are neither 'an Apollo or Hercules.' Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914 (1930). Recovery is not defeated when a preexisting condition or disorder is so remote in the scale of causation, so dormant and insubstantial, or so temporary and transient that it does not materially contribute to the death or injury. Howe v. National Life Ins. Co., 321 Mass. 283, 72 N.E.2d 425, 170 A.L.R. 1254 (1947). In most cases, the competent evidence of qualified persons separates the real causes of death or injury from mere conditions or at least raises issues for the determination by the fact finder. 29A Am.Jur., Insurance, §§ 1211–1213; 82 A.L.R.2d 614, 623; 56 A.L.R.2d 806–808; 131 A.L.R. 266–269; 1A Appleman, Insurance Law & Practice, § 403, p. 88."

I believe that under the evidence it was within the province of the jury to say whether the weakened condition of Mr.

Morris due to the ingestion of an undetermined amount of cyanide "materially contributed" to his death.

I concur in the Court's opinion.